Filed 4/7/14  In re Maleah Y. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re MALEAH Y., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY Y.,<br><br>    Defendant and Appellant. | F068010<br><br>(Super. Ct. No. 516172)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Anthony Y. (father) appeals the September 16, 2013, Welfare and Institutions Code section 366.26[1] order terminating parental rights to his daughter Maleah, now age six. Father's son, Colton, now age 11, is not a subject of this appeal as the juvenile court did not terminate father's parental rights to him, instead ordering a permanent plan of long-term foster care.

Father contends separate counsel should have been appointed for the minors. He also contends the juvenile court erred in failing to find the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)) and the beneficial parent-child relationship (§ 366.26, subd. (c)(1)(B)(i)) to adoption. We affirm.

## PROCEDURAL AND FACTUAL HISTORY

Aside from Colton and Maleah (together "minors"), father also has two grown children from a previous relationship. Father, now age 57, used various drugs since age 18, including marijuana, heroin, LSD, mescaline, peyote, "reds and yellows," and methamphetamine. At the outset of this case, he reported being on methadone for the past year. He suffers from a number of health issues, including cirrhosis of the liver due to extensive alcohol abuse. His criminal history dates back to 1979 and includes charges of carrying a concealed weapon, vandalism, receipt of stolen property and possession.

The minors' mother, Lynette D. (mother), who is not a party to this appeal, also has a long history of drug use, including heroin and methamphetamine.

In July of 2011, the Stanislaus County Community Services Agency (the Agency) received a referral alleging there was domestic violence in the home of mother and father and that each called the other terrible names in front of the minors. Colton, then eight years old, stated that his parents fought often. At the time, father had sole custody of the minors and there was a family law order that mother was to have only supervised

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

visitation. But father admitted that mother was living in the home. Mother admitted she recently tested positive for drugs; and father admitted he had been drinking, became frustrated when he found mother "using" in the family bathroom, and "pushed" her. Father also admitted leaving the minors alone with mother, but claimed it was only for a short period of time.

A safety plan was agreed to in August of 2011, which required mother to leave the home and not be around the children unsupervised. There was to be no physical or verbal domestic violence. Father was informed that the minors would be removed if he did not follow the plan.

In September of 2011, the Agency received another referral, stating that mother was back in the home and domestic violence was again occurring in front of the minors. Colton was interviewed at school and admitted that his mother was living in the home. Colton also stated that his father does not like his sister Maleah and calls her bad names. According to Colton, mother spends the night at the house and then takes Maleah with her to her own parent's home during the day. Colton said the loud yelling in the home makes him "nervous and scared."

Mother acknowledged that she moved back into the home almost immediately after the safety plan agreed to six weeks earlier. Mother said father calls her a "[f]ucking whore" and "[f]ucking bitch" in front of the children.

Both mother and father have a long history of Agency referrals dating from 1998 to the present, which involved the minors and their older half siblings. Both minors were born positive for substances. Colton had been a dependent of the court from shortly after his birth until July of 2004. At the time of Maleah's birth, Colton was in guardianship with his maternal grandparents.

The apartment where the family lived was small, very messy, and had numerous unlabeled bottles of pills scattered within reach of the minors. Father was unable to identify what the pills were or what they were for.

*Section 300 Petition and Detention*

A section 300 petition was filed September 26, 2011, alleging that mother and father failed to protect the minors from harm due to an ongoing history of domestic violence (§ 300, subd. (b)); that the minors were likely to suffer serious emotional damage (§ 300, subd. (c)); and that minors had stepsiblings who had been abused or neglected, citing mother's older children who were now living with their paternal relatives (§ 300, subd. (j)). The minors were ordered detained. A week later, they were moved from foster care to the home of their maternal grandparents.

*Jurisdiction and Disposition*

The jurisdiction/disposition report stated that, when he was detained, Colton had a fairly serious problem with soiling himself and bed-wetting, and he had seven cavities. He was shy and was referred for a developmental and emotional assessment. Maleah was healthy and developmentally on target.

Both mother and father had substance abuse, law enforcement and child neglect issues. They had a codependent and dysfunctional relationship. And despite a family law order giving father sole custody, mother appeared to be the minors' primary caretaker. Both minors were constantly exposed to their parents domestic violence, and father had begun to include Colton in emotional and verbal "harang[u]ing." Colton had begun to demonstrate those same behaviors at school, where he pushed, hit and threatened other students.

The social worker expressed concern that father, at age 55, and mother, at age 43, would not be able to make changes to their long entrenched behaviors. She suggested that placing the minors voluntarily with the grandparents as guardians was an option. Barring guardianship, dependency with extensive reunification services was recommended.

On November 9, 2011, both mother and father submitted on an amended petition and were granted reunification services.

*Interim Review Report*

A February 29, 2012, interim review report stated that the minors were with their maternal grandparents, but that the grandparents had been given a seven-day notice by their homeowners association that the children could not live with them, as they lived in an over 55 community. Colton was in counseling; Maleah was waiting for a spot in Head Start.

*Section 366.21, Subdivision (e) Six-Month Status Review*

The six-month status review report stated that the minors were together in a foster home. Both mother and father were participating in services, although they had attended only four of 10 scheduled couple's counseling classes to date. Their relationship was described as "very fragile." Mother and father had been visiting the minors for two hours each week at the Agency offices, but the therapist conducting the counseling recommended that increased visits with the minors not take place until counseling was completed.

Father's clinical assessment recommended that he be further assessed for underlying mental health issues. Father had participated in random drug testing and tested negative for all substances other than methadone. He completed an outpatient drug treatment program and was working on a 12-step program.

During his clinical assessment, father stated he was "wrongfully" involved with the Agency, blaming a neighbor for turning him in. He also reported that he had been clean from drugs other than methadone for a year and a half.

At the May 4, 2012, six-month review hearing, reunification services were continued. The social worker was given discretion to institute extended and overnight visits.

*Section 366.21, Subdivision (f) 12-Month Status Review*

An October 11, 2012, Court Appointed Special Advocate (CASA) report prepared for the 12-month review hearing described Colton, in grade six, as bright, quiet and not

5.

very outgoing. He was on medication for ADHD. He had been exhibiting some sexualized behavior and more specific counseling was recommended. Maleah, in kindergarten, was described as outgoing, affectionate, and very bright, but could easily get off task and needed to be reminded of her boundaries.

The status review report prepared in anticipation of the 12-month review hearing stated that mother was making limited progress in her case plan. She was not attending counseling and reported being depressed. Visits had not been increased, pending her participation in counseling. She was terminated from two different drug treatment programs after failing to test properly.

Father was participating more fully in his plan. He was attending a 52-week domestic violence course. He completed individual counseling and a parenting program.

Father had one two-hour visit each week and one four- to six-hour visit each weekend with the minors. He was expected to start overnight visits on October 27, 2012. Mother was still receiving just one two-hour visit per week until she made progress in her case plan. Mother signed a statement that she would not be present during any portion of an overnight visit between the minors and father.

At the November 20, 2012, review hearing, the juvenile court authorized a trial overnight visit with father provided mother was not in the home and was in a residential treatment center.

*Section 366.22 18-Month Permanency Review*

A March 1, 2013, CASA report prepared in anticipation of the 18-month review hearing stated that both Colton and Maleah continued to live together in foster care. Maleah had an appointment for an ADHD evaluation, as she was exhibiting such symptoms. The foster parents expressed some frustration with both minors' behaviors, and it was unclear whether it was associated with the recent start of overnight visits with father. The foster parents noted that the minors returned from overnight visits dirty, hungry and with insect bites or a rash. The CASA made an unannounced visit to father's

6.

home during an overnight visit and was concerned with the safety of the minors in the home. This information was immediately reported to the social worker.

Colton reported that he did not like foster care and wanted to live with father. Maleah did not provide a statement.

The status review report prepared in anticipation of the 18-month/permanency review hearing recommended terminating service to both mother and father and recommended long-term foster care for the minors.

Mother had not completed any aspect of her case plan. She was discharged from the methadone program and was again actively using street drugs.

Father completed all remaining elements of his plan, but continued to demonstrate an inability to exercise good judgment regarding the minors. The Agency stated that it "has gone to great lengths to support [father] in developing tools and strategies to safely parent his children. These efforts have been to no avail."

Prior to home visits, the social worker conducted a home inspection. Father was told not to expose the minors to second-hand smoke. During the home visit, father discussed his neighbor, against whom he had taken out a restraining order because the neighbor threatened to kill him and mother. Father stated he was still having problems with the neighbor and the neighbor's teenage daughter had thrown a rock through the window. The broken glass was still in the home. Father said he preferred visits in the community to avoid contact with the neighbor.

Father's first overnight visit was approved for February 9, 2013. After the visit, Colton reported to the social worker that he had been left home alone while father went to the store with Maleah.

On the second overnight visit the following weekend, the CASA made an unannounced visit and spent about an hour in the home. She reported that the home was filthy with an open and unlabeled prescription bottle within reach of the children. There was also a "brown leafy substance" in a folded piece of paper on the television, also in

7.

reach of the minors. The smoke detector constantly beeped. When confronted by the social worker and CASA to discuss the concerns, father admitted the problems and said he was not focused on safety because he was "having a blast" with the minors.

The following weekend, the social worker made an unannounced visit during the minors' overnight visit. Colton was seen riding a scooter several houses down from the apartment complex with no one monitoring him. Father was standing in the door smoking a cigarette and there were two beer cans in the living room. Father said Maleah was visiting a neighbor. The social worker then saw Maleah exiting the apartment of the neighbor against whom father had a restraining order. Father said that Maleah had asked the neighbor if she could pet her dog. Father thought it a good way to "break the ice" with the neighbor. Father also asked the teenager who had broken his window to watch Colton while he was on his scooter. Father minimized the cigarette and beer use. A can of spray paint and bag full of prescription medications was on the floor next to father's chair. Father said he did not think the minors would get into them. The social worker ended the visit early.

A March 15, 2013, additional information report changed the recommendation for the minors to adoption as the permanent plan.

At the May 3, 2013, 18-month review hearing, the social worker testified that father had had only three overnight visits before the visits had to be moved back to the Agency. During the visits at the Agency, father exhibited no parental authority over the minors. He could not get them to listen to him and could not get Colton to obey him at all. The social worker had to intervene.

Mother testified in support of father. She stated father was not the primary caregiver, "but he wants to be." Mother was in jail at the time for petty theft. She was still actively using drugs.

The juvenile court found that father had completed the components of his case plan, but he was just going "through the motions," and therefore had not "really

successfully completed the component." The juvenile court terminated services for both mother and father and a contested section 366.26 hearing was set for September 5, 2013.

*Contested Section 366.26 Hearing*

The 366.26 WIC Report prepared in anticipation of the section 366.26 selection and implementation hearing stated that the minors were no longer in the same placement. Maleah remained in the foster home she had been in and the foster parents wished to adopt her. Colton had to be moved to another foster home because he was exhibiting aggressive and violent behavior toward Maleah. Colton was adamant that he did not want to be adopted by anyone. But the proposed adoptive family for Maleah maintained that they were committed to Colton if he changed his mind.

Mother and father together visited the minors separately so Colton would not endanger Maleah. Visits were now supervised because father had said inappropriate things to the minors during previous visits.

On September 5, 2013, counsel for father refused to accept a one-day late-filed report, requiring a continuance until September 16, 2013.

Counsel for the minors asked that Maleah's visits be scaled back in the meantime as she was very anxious about visits and acted out by hitting and kicking for several days afterward. The juvenile court ordered that no visits would occur prior to the next hearing 11 days away. Counsel for the minors also asked if a clinician could be located to work with the minors to help "put their relationship back together."

At the September 16, 2013, contested hearing, the Agency made an offer of proof regarding the reasons for placement changes. The minors had been placed together until May 4, 2013, when Colton's behavior became a safety issue for Maleah. He was removed and placed in a separate foster home where he was doing well. The juvenile court was advised that the proposed adoptive parents of Maleah were interested in a formal postadoption contract for contact between the minors after adoption.

9.

Maleah's foster mother testified that they are 100 percent committed to adopting Maleah, and were also committed to having Colton back in their home if he received the therapy needed to prevent him from being a safety risk.

An offer of proof was made that mother objected to adoption for Maleah because she believed Maleah would like to continue a relationship with mother, father and Colton.

Father testified that Maleah was in his care for about a year and mother had been there "helping out." Father described his relationship with Maleah as "okay." Father testified that the minors had always played together and were close "before all this mess happened." Father did not think Maleah was old enough to be adopted. Father claimed Colton never lived with his grandmother after Maleah was born, although the Agency made an offer of proof that grandmother, who was present in the courtroom, would refute that fact.

Counsel for the minors concurred with the recommendation of the Agency that parental rights be terminated as to Maleah and that long-term foster care be established for Colton.

The juvenile court found that mother and father failed to establish that termination of parental rights would be detrimental to Maleah under either the beneficial parent-child relationship exception or the sibling exception. The juvenile court terminated parental rights as to Maleah and ordered adoption as the permanent plan.

The juvenile court also found there was clear and convincing evidence that there was a compelling reason not to set a section 366.26 hearing for Colton. Instead, the best permanent plan for him was placement with foster mother "with a specific goal of independent living and identification of caring adults to serve as a life-long connection."

**DISCUSSION**

I.  SEPARATE COUNSEL

Father claims reversal is required because separate counsel should have been appointed for Colton and Maleah.  He argues that the interests of the minors varied and were in conflict.

The Agency contends father forfeited the issue by failing to raise it in the juvenile court.  The Agency further maintains that, in any event, there was no actual conflict or prejudice shown.

We agree that father has forfeited the issue on appeal (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2).  Nonetheless, we will address the issue on the merits.  In reviewing father's claim, we presume father has established how any alleged conflict of interest pertaining to counsel for the minors has affected him, sufficient to establish "standing" to make the claim.  (*In re Frank L.* (2000) 81 Cal.App.4th 700, 703.)

The issue of counsel for multiple minors was addressed by the Supreme Court in *In re Celine R.* (2003) 31 Cal.4th 45 (*Celine R.*).  The court held,

> "the [juvenile] court may appoint a single attorney to represent all of the siblings unless, at the time of appointment, an actual conflict of interest exists among them or it appears from the circumstances specific to the case that it is reasonably likely an actual conflict will arise.  After the initial appointment, the court must relieve counsel from the joint representation when, but only when, an actual conflict of interest arises."  (*Id.* at p. 50.)

Further, "error in not appointing separate counsel for a child or relieving conflicted counsel" requires reversal only if it is reasonably probable the outcome would have been different but for the error.  (*Id.* at p. 60.)

Father acknowledges that the record here does not indicate an actual conflict between the minors when the juvenile court first appointed one counsel, Catherine Hallinan, for both minors on September 27, 2011.  Father acknowledges further that the record indicates no conflict at the six-month review hearing on April 25, 2012 (which was then continued to May 4, 2012), where attorney Kimberley Ayers was said to

11.

represent the minors and that Catherine Ries was appearing for Ayers that day. Ayers continued to appear for both minors until March 15, 2013, when the juvenile court relieved Ayers and appointed David Meyers to represent the minors. Meyers then appeared for both minors at the May 3, 2013, 18-month review hearing.

In father's view, actual conflict between the minors arose when, shortly after the May 3, 2013, hearing, Colton was moved to another foster home. At around the same time, Colton reported that he no longer wanted to be adopted and a permanent plan of long-term foster care was recommended for him.

On September 5, 2013, when the section 366.26 hearing was initially set, the record indicates that "the Minors" were represented by Meyers and Jennifer Trimble, who were both present. Trimble addressed the juvenile court about Maleah's anxiety surrounding visits and asked that they be "scaled back pending the next hearing." Trimble also requested that the Agency get a clinician "to work with Maleah and Colton together, and hopefully we can kind of put their relationship back together." Meyers did not address the juvenile court on that date.

At the continued section 366.26 hearing as to Maleah and the section 366.3 hearing as to Colton, held September 16, 2013, the record states:

> "Colton is present. His sister, Maleah, is not here today. Their attorney, Mr. Meyers, is not here. Ms. Trimble is making a special on behalf of Mr. Meyers."

Trimble, on behalf of the minors, called Maleah's foster mother, now prospective adoptive mother, as a witness. She was questioned about her commitment to both Maleah and Colton. Trimble agreed with county counsel that Maleah was adoptable and that her adoptive parents were 100 percent committed to her.

Father seems to argue, in effect, that by advocating adoption for Maleah, Trimble was unable to advocate in favor of Colton's interest in opposing the adoption so as to preserve their sibling relationship. As such, he contends the juvenile court erred by failing to appoint separate counsel for each minor.

12.

The decision in *Celine R.,* involved multiple representation of an older child and her two younger half siblings, although counsel asked that separate counsel be appointed. (*Celine R., supra,* 31 Cal.4th at p. 55.) After the social services agency recommended adoption for the younger siblings, the older sibling told their counsel she would be "hurt and saddened" if she were to be separated from her sibling group as a result of the adoption of her younger siblings. (*Id.* at p. 54.) Here, in contrast, there is nothing in the record of this proceeding to show that Colton ever voiced a similar concern. Although he was present in court on two occasions, father did not call him or seek his opinion about the possible interference of his relationship with Maleah.

We agree with the Supreme Court's observation that "[c]hildren's interests are not always adversarial, and … should not always be treated as such." (*Celine R., supra,* 31 Cal.4th at p. 56.) As such, we do not accept the assumption implicit in father's contention that an actual conflict arose because Colton's interests were necessarily to oppose the adoption of Maleah so as to preserve the sibling relationship.

Even if we were to assume that an actual conflict of interest did arise when the Agency recommended adoption for Maleah, father has not made the necessary showing of actual prejudice. We will not reverse a juvenile court's order based on its failure to appoint separate counsel for multiple minors, unless it appears reasonably probable there would have been a different result had the error not occurred. (*Celine R., supra,* 31 Cal.4th at pp. 59-60.) As we conclude below, we find that the trial court did not err when it found that the "sibling exception" did not exist here. Even if separate counsel for Colton and Maleah had additionally advocated the application of this exception, we reach the same conclusion for the same reasons.

## II. ADOPTION

Once reunification services to the natural parents have been terminated and the dependency proceedings reach the section 366.26 hearing, as it did here for Maleah, the focus shifts to the needs of the child for permanency and stability, and adoption is the

preferred permanent plan decreed by the Legislature. (§ 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) A section 366.26 hearing is designed to protect the child's compelling rights to have a placement that is stable, permanent, and that allows that caretaker to make a full emotional commitment to the child. (*In re Marilyn H., supra,* at p. 306.)

If the juvenile court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subd. (c)(1)(B); *Celine R., supra,* 31 Cal.4th at p. 53.) The statutory exceptions merely permit the court, in exceptional circumstances, to choose an option other than adoption. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348-1349; *Celine R., supra,* at p. 53.) "[T]he party claiming an exception has the burden of proof of establishing by a preponderance of evidence that the exception applies." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D., supra,* at p. 1350.)

We review the juvenile court's decision regarding the applicability of exceptions to the adoption preference for an abuse of discretion. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 123; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "When applying the deferential abuse of discretion standard, 'the [juvenile] court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations.]" (*In re C.B., supra,* at p. 123.)

A. *Sibling Relationship Exception*

Father claims the juvenile court erred in failing to apply the sibling relationship exception to Maleah's adoption. We disagree.

Father's claim is premised on the statutory exception to adoption contained in section 366.26, subdivision (c)(1)(B)(v). Under that provision, the juvenile court may find a compelling reason for determining that termination of parental rights would be detrimental to the minor when adoption will result in a "substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).) In evaluating whether this exception applies, the court considers "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*) "[E]ven if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952-953.) "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822; *Celine R., supra,* 31 Cal.4th at p. 49.)

Here, the minors are five years apart in age. At the time Maleah was born, Colton was in guardianship with his grandmother. Colton was described as shy; Maleah as outgoing. The only evidence of any common interests was father's testimony that Colton was protective of Maleah and that the two played together. But more importantly, in the recent past, the two had not lived together because Colton had become violent and aggressive toward Maleah. They were not even having visits together due to Colton's behavior. Maleah thrived in the foster home since her brother left.

15.

The juvenile court was warranted in concluding that the detriment the minors would suffer in this case from potentially severing their sibling relationship did not outweigh the benefit Maleah would derive from being adopted.  The authors of the legislation adding the sibling exception envisions that its applicability would "'likely be rare.'"  (*In re L.Y.L,, supra,* 101 Cal.App.4th at p. 950.)  This language has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption."  (*Ibid.*)

There was simply no evidence that termination of father's parental rights would substantially interfere with Maleah's sibling relationship.  Thus, the juvenile court did not abuse its discretion in concluding this exception did not apply.

B.  *Parental Benefit Exception*

Father also contends that the juvenile court erred in failing to apply the parent-child relationship to defeat Maleah's adoption.  We disagree.

"An exception to the adoption preference applies if termination of parental rights would be detrimental to the child because the 'parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)"  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)  The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

16.

"A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "[T]he parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.] The parent must … prove he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) And while day-to-day contact is not necessarily required, "it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

> "The Legislature emphasized the exceptional nature of all the circumstances identified in section 366.26, subdivision (c)(1) by revising the statute in 1998 to require the court to find not only that one of the listed circumstances exists, but also that it provide 'a compelling reason for determining that termination would be detrimental to the child.' [Citation.] This amendment … makes it plain that a parent may not claim entitlement to the exception provided by subdivision (c)(1)(A)[2] simply by demonstrating some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1349.)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the

---

**2** Former statute, now subdivision (c)(1)(B)(i).

child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) "'While friendships are important, a child needs at least one parent. Where a biological parent … is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.] Thus, a child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent. It would make no sense to forgo adoption in order to perverse parental rights in the absence of a real parental relationship." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

Father asserts that Maleah would benefit from continued contact with father because she had been in his custody for the first four years of her life; he visited her weekly and had missed only one visit; she called him "daddy" or "dad" during the visits; and she ran up to him, hugged and kissed him, and jumped into his arms at each visit. Father argues that he complied with his case plan and that, although he had not internalized general parenting skills as yet, a permanent plan of long-term foster care or guardianship would have been more appropriate.

At the contested section 366.26 hearing, father had the burden of establishing both prongs of the parental relationship exception. He had to show he maintained regular contact with Maleah and that she would benefit from a continued parental relationship with him. (§ 366.26, subd. (c)(1)(B)(i).)

Father satisfies the first prong by showing he maintained regular visitation with Maleah. As to the second prong of the exception, however, the record supports the juvenile court's determination that father failed to make the requisite showing. While father did have custody of Maleah until she was almost four years old, he was not the primary caretaker. Instead it was mother, who was not supposed to be in the home, who

18.

filled that role. When father had Maleah for a weekend visit, he let her go unaccompanied into the home of a neighbor father professed to be dangerous and threatening and against whom he had a restraining order. Father smoked and drank during visits, and he failed to secure prescription pills from the minor's reach. Visits went from being monitored to supervised because father said inappropriate things to Maleah, causing her to leave the visit in tears. Additionally, Maleah was said to be very anxious about the visits, causing her to act out for days afterward. Maleah did better under the care and stability of her caretakers.

Father did not show that his relationship with Maleah, while perhaps of some benefit, was worth denying her an opportunity for a stable and loving home with the real parental relationship adoption would provide. No abuse of discretion has been shown.

**DISPOSITION**

The juvenile court's orders are affirmed.

_____
Franson, J.

WE CONCUR:


_____
Gomes, Acting P.J.


_____
Poochigian, J.

19.